2008 VT 29

**In re Appeal of SHAW**

[945 A.2d 919]

No. 06-463

*Durkin,* J.

¶ 1. March 7, 2008. Several nearby landowners (neighbors) appeal the Environmental Court's decision granting Rinkers Communication's application for conditional-use approval to build a telecommunications tower in Hardwick, Vermont. Neighbors contend on appeal that the Environmental Court erred by: (1) concluding that the proposed tower would not have an undue adverse effect on scenic resources; and (2) concluding that there were no alternative sites for the tower. We affirm.

¶ 2. The Environmental Court found the following facts after a site visit and two days of hearings. Rinkers proposed to construct a telecommunications tower near the top of Bridgman Hill in Hardwick, on leased property previously used for a shorter tower and various other communications equipment. The proposed "lattice-type" tower is 180 feet tall, and is topped by a nearly twenty-foot antenna that will provide pager service for Rinkers.

¶ 3. The design of the tower allows it to accommodate several two-way radio antennas which could be used by police and emergency service providers, as well as wireless broadband service antennas and cellular service antennas. A shorter tower could accommodate fewer antennas than the proposed tower.

¶ 4. Rinkers maintains several similar towers in central Vermont in connection with its business of providing paging services to, among others, public safety and medical-services providers. Rinkers also leases space on some of its towers to other providers for telecommunications purposes, including providing cell-phone service, which is currently nonexistent in Hardwick.

¶ 5. The site where the new tower is proposed to be built is a sloping field bordered on the north by trees, some of which are over sixty feet tall. The existing pager antenna, which is mounted atop a thirty-nine foot pole, provides inconsistent service due in part to the surrounding trees and topography. Although the proposed tower will not, due to the undulating terrain in Hardwick, provide complete coverage over the entire town, the tower will enable wireless communication in much of Hardwick.

¶ 6. The site is in Hardwick's "Compact Residential District" as defined in the town's zoning bylaws. Telecommunications facilities require a conditional-use permit before being built in the Compact Residential District. Rinkers applied first to the Hardwick Zoning Board of Adjustment and was granted a permit for a 100-foot tower with a 20-foot paging antenna to be attached to the top of the tower. Neighbors appealed to the Environmental Court, and Rinkers cross-appealed. Upon de novo review, see 24 V.S.A. § 4472, the court granted Rinkers' application for a 180-foot tower with a 20-foot antenna, subject to several conditions.

¶ 7. Our review of the Environmental Court's decision is deferential. We will affirm the court's interpretation of a zoning ordinance unless it is clearly erroneous, arbitrary, or capricious. *In re Wesco, Inc.,* 2006 VT 52, ¶ 7, 180 Vt. 520, 904 A.2d 1145 (mem.). We review the Environmental Court's determination of whether a

project has an undue adverse effect on scenic resources for clear error. Cf. *In re Miller*, 170 Vt. 64, 69, 742 A.2d 1219, 1223 (1999) (reviewing for clear error the Environmental Court's determination of whether a project had an adverse effect on the residential character of the project's neighborhood). "The environmental court's findings of fact will be upheld if based on relevant, admissible evidence that a reasonable person would consider as supporting the conclusion." *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 11, 176 Vt. 584, 845 A.2d 332 (mem.). Findings of fact will not be disturbed, even in the presence of substantial modifying evidence, if there is credible evidence supporting them. *In re Beckstrom*, 2004 VT 32, ¶ 14, 176 Vt. 622, 852 A.2d 561 (mem.).

¶ 8. Neighbors' first general claim of error is that the Environmental Court's conclusion that the tower would not adversely affect scenic resources was clearly erroneous. In support of this claim, neighbors make three related contentions: (1) that there was no evidence and no findings to support the conclusion; (2) that the court failed to make specific findings regarding the telecommunications-tower siting standards in the Hardwick zoning bylaws; and (3) that the proposed tower does not comply with the Hardwick bylaws' provisions regarding telecommunications facilities generally.

¶ 9. Neighbors' quarrel with the Environmental Court's adverse-impact conclusion is resolved by our deferential standard of review. Section 4.15(F)(5) of the Hardwick zoning bylaws states that "[n]ew telecommunications facilities, including towers, shall be sited and designed to minimize their visibility and not result in an undue adverse impact on the town's scenic landscape." Neighbors direct our attention to certain evidence in the record tending to support a conclusion that the tower would have an undue adverse impact. But this is precisely the modifying evidence that is within the

province of the finder of fact to weigh against other conflicting evidence. See *Beckstrom*, 2004 VT 32, ¶ 14 ("We will not disturb the trial court's factual findings unless, viewed in the light most favorable to the prevailing party, and disregarding any modifying evidence, they are clearly erroneous.").

¶ 10. Here, the Environmental Court found that the design of the tower minimized visibility with a lattice-type design, that the height of the tower encouraged colocation, that the sloping field and existing trees provided good screening for the neighboring properties, and that the property had been the site of telecommunications facilities for decades. Viewed in the light most favorable to Rinkers, and disregarding the modifying evidence, we cannot say that the Environmental Court's conclusion on this point is clearly erroneous. Neighbors are simply not correct in asserting that there was no evidence and no findings supporting the conclusion. The fact that neighbors — or even this Court — might have weighed the evidence differently is not grounds for reversal.

¶ 11. Neighbors also contend that the Environmental Court failed to make findings about several specific sections of the bylaws. First, neighbors argue that the court ignored the "Purpose" section of the bylaws, the "entire thrust" of which, they contend, is the preservation of the town's natural and scenic beauty. But neighbors ignore half of the statement of purpose and read the Environmental Court's decision too narrowly. The purpose statement simply declares that competing interests are to be accommodated in siting telecommunications facilities in Hardwick: "[t]he purpose of these regulations is to protect the public health, safety, general welfare and scenic character of the Town of Hardwick, *while accommodating the communication needs of residents and businesses*." (Emphasis added.) Similarly, while neighbors argue

that the "most important sections" of the bylaws involve preservation, the final intent provision articulates the other competing interest to be accommodated: "(5) . . . the provision of telecommunications services to residents and businesses in town." Neighbors' reading of the bylaws would put a massive anti-development thumb on one side of the scale, a result the bylaws do not require.

¶ 12. Neighbors next contend that the Environmental Court failed to make required findings about the visual impact of the tower. Specifically, neighbors argue that the court did not adequately consider subsections (i), (ii), (iv), (vi), and (vii) of § 4.15(F)(5)(a), which provide several criteria to be considered in determining whether "a facility's impact on scenic resources would be undue and adverse":

 i. the period of time during which the proposed tower would be viewed by the traveling public on a public highway;

 ii. the frequency of the view experienced by the traveling public;

 . . . .

 iv. background features in the line of sight to the proposed tower that obscure the facility or make it more conspicuous;

 . . . .

 vi. the sensitivity or unique value of a particular view affected by the proposed tower, including scenic features or landscapes identified in the *Hardwick Town Plan* and/or through a site assessment; and

 vii. the potential disruption to a viewshed that provides context to a historic or scenic resource.

¶ 13. While neighbors are correct that the Environmental Court did not explicitly state which of its findings were responsive to which of the requirements in § 4.15(F)(5)(a), the court's findings are nonetheless adequate to support its conclusions.

¶ 14. The court began its analysis by recognizing the balancing act involved in siting communications towers. On the one hand, Hardwick's bylaws allow communications towers to be built as a conditional use in the Compact Residential District, and also recognize that towers may need to be as tall as 180 feet in order to encourage colocation and provide acceptable levels of service. On the other hand, many of the telecommunications facility standards in the bylaws require steps to minimize the aesthetic impact of such towers.

¶ 15. The court found that the proposed tower would be visible from "several locations, including the homes or farms of most" of the neighbors, and that existing trees would shield approximately the bottom half of the proposed tower from view. The court further found that all "ground-mounted equipment" would be screened from view. According to the court, the "lattice-type design of the tower" would also minimize the visual impact of the visible portion of the tower. There was testimony at trial that a communications tower that was not visible from many locations would not be a useful tower, because many communications technologies depend on line-of-sight transmission.

¶ 16. As to subsections (i) and (ii), the Environmental Court heard testimony, and considered other evidence, that supports a conclusion that the tower would be only minimally visible to the traveling public. The court had before it the results of a balloon test — in which a large balloon on a 180-foot string was floated at the proposed tower site and then photographed from several locations in Hardwick. Neighbors conceded that the tower would be visible to drivers "for a matter of minutes,"

but contended that "anyone traveling under human power could easily be looking at it for half-hour or more." The Environmental Court's decision reflects a conclusion, supported by the evidence, that the tower's visibility to the traveling public was not so widespread as to foreclose a permit. We will not disturb this fact-bound conclusion on appeal.

¶ 17. Neighbors contended, as to subsections (iii), (iv), and (v), that "[t]he tower would not be screened by anything." Neighbors further asserted that "virtually the entire structure would be visible" and that it would "dwarf" nearby structures. Finally, neighbors lamented that "[r]ather than high on a faraway hilltop, the tower would be close to the road and to houses in the area." But the court had ample evidence before it supporting a finding that the structure would be partially screened by trees, some of which were over sixty feet tall. Further, there was evidence that the sloping topography minimized the tower's visibility from many locations. Moreover, neighbors do not contend that the tower does not meet the specific setback requirements in the bylaws, only that their subjective opinion is that it is too close to their homes and the road. We see no basis to reverse the Environmental Court's implicit conclusion that subsections (iii), (iv), and (v) do not foreclose the permit.

¶ 18. Finally, neighbors argued that the proposed tower would violate Bylaws § 4.15(F)(5)(a)(vi) and (vii). Subsection (vi) requires consideration of "the sensitivity or unique value of a particular view affected by the proposed tower, including scenic features or landscapes identified in the *Hardwick Town Plan* and/or through a site assessment," while subsection (vii) concerns "the potential disruption to a viewshed that provides context to a historic or scenic resource." Neighbors' argument on this point relied entirely on several general admonitions in the Hardwick Town Plan favoring protection of "farmland and forest," "hills, mountains and bodies of water," "scenic resources," "mountains, hills, and ridgelines," and "a rural and natural skyline." These provisions, as their very phrasing makes clear, do not have "the force and effect of a legislative enactment." *In re Wesco*, 2006 VT 52, ¶ 33. They are, rather, "aspirational," *id.*, and "abstract and advisory." *Kalakowski v. John A. Russell Corp.*, 137 Vt. 219, 223, 401 A.2d 906, 909 (1979).

¶ 19. Neighbors' more general assertion that a permitting decision that fails to explicitly address all seven criteria "had to be purely subjective" does not convince us to reverse the Environmental Court's decision, which is facially reasonable and supported by the record, as detailed above.

¶ 20. Neighbors next argue that the Environmental Court's decision also runs afoul of § 4.15(F)(5)(c), which expresses a preference for siting telecommunications towers in forested areas when "feasible":

> Telecommunications facilities should be installed in forested settings wherever feasible. No tower, antenna and/or associated fixtures or equipment shall exceed a height of 20 feet greater than the average height of the canopy measured within a 200 foot radius of the facility. A management plan may be prepared and submitted to the Board to ensure that the adjoining tree cover will be maintained to create the visual impression of the tower and/or associated equipment emerging from a largely unbroken tree canopy and protruding no more than 20 feet above that canopy.

Neighbors argue, first, that Rinkers failed to show that siting the tower in a forested area was not feasible. Second, they contend that even a tower in a field, like this one, must comply with the strictures of § 4.15(F)(5)(c).

¶ 21. As to the first contention, there was testimony that previous attempts to build a tower on Buffalo Mountain, a prominent forested hill in Hardwick, had foundered due to citizen opposition. Although there was a willing landowner on Buffalo Mountain, access to the available land was difficult and would have required both extensive road improvements and nearly half a mile of new power lines. Evidence was also introduced that Buffalo Mountain is explicitly mentioned in the Hardwick Town Plan as an important scenic resource, and is "much more prominent for the downtown Hardwick area" than the Bridgman Hill site.

¶ 22. On this point, neighbors also assert that it was error for the Environmental Court to refer to a study prepared for the town concerning potential sites for telecommunications facility (Hutchins study). Neighbors' contention that the study was not offered into evidence during the trial is directly contrary to the record. Two neighbors at the trial clearly testified to their desire that the study be admitted into evidence. In response, the Environmental Court assured them that the study had been "submitted in the course of the motions that were filed." No objection to the study was made to the Environmental Court. Accordingly, any claim of error in admitting or relying on the study is waived. The study, coupled with the Rinkers testimony, provides ample credible evidence in support of the Environmental Court's conclusion that no forested sites in Hardwick were feasible. Neighbors' conclusory argument that the citizens of Hardwick support a tower on Buffalo Mountain is just the sort of modifying evidence that we disregard under our deferential standard of review.*

---

* Neighbors also object specifically to the Environmental Court's purported reliance on the portions of the study that assert that a prior application for a tower on Buffalo Mountain had failed. But the

¶ 23. Neighbors' argument that the tower, despite its location in the center of a field, must nonetheless comply with § 4.15(F)(5)(c), is unconvincing. The plain terms of that provision express a preference for siting towers in forested settings "wherever feasible," but do not suggest that no tower may ever be built in a field. The forest-specific provisions in the remainder of § 4.15(F)(5)(c) simply cannot coherently be applied to a site like this one. Accordingly, the only explicit height limits on telecommunications towers built in fields in Hardwick are in the general provisions of § 4.15(F)(5) and (F)(5)(b), which are discussed below. See *infra*, ¶¶ 25-27.

¶ 24. Neighbors also contest the Environmental Court's conclusion that the proposed tower does not violate § 4.15(F)(5)(e), which provides as follows:

Telecommunications facilities shall be designed to blend into the surrounding environment, to the greatest extent feasible, through the use of natural topography, existing vegetation, landscaping and screening, the use of compatible materials and colors, and/or other camouflaging techniques. Camouflaging techniques

---

court simply cited the study for the proposition that "a tower of greater than 150 feet on Buffalo Mountain . . . would face serious opposition," and noted that a project on Buffalo Mountain "already failed to receive municipal approval for a tower similar to that proposed here." Neighbors assert that a permit was granted for the site. It appears from the record that a permit was granted, but for a much shorter tower than was applied for, and that the tower was never built. Even assuming that neighbors preserved this argument for our review, the Environmental Court did not commit clear error in determining that Buffalo Mountain was not a feasible site for this tower.

which may be required by the Board include designing the facility to mimic natural or architectural features, depending upon the context of the surrounding landscape and applicable zoning districts.

This argument parallels neighbors' adverse-impact argument, and fails for the same reasons. See *supra*, ¶¶ 8-10.

¶ 25. Next, neighbors would have us find clear error in the Environmental Court's decision to permit Rinkers to build a 180-foot tower topped by a 20-foot antenna, rather than a 100-foot tower with the same antenna. This, according to neighbors, plainly violates § 4.15(F)(5), which states: "[i]n no case shall a tower and all associated telecommunications facilities exceed a height of 180 feet." The definitions of the pertinent terms in the zoning bylaws dispose of this argument.

¶ 26. The zoning bylaws define "tower" as "[a] vertical structure *for antenna(s)* and associated equipment that provide telecommunications services." (Emphasis added.) The bylaws also define "antenna height" as "[t]he vertical distance measured from the base of the antenna support structure at grade to the highest point of the structure." Although the Environmental Court did not cite the definitions, its approval of the 180-foot tower implicitly adopted a construction under which a "tower" is the structure which supports the antennas, and does not include the antennas themselves. This construction of the zoning bylaws is not clearly erroneous, arbitrary, or capricious. Neighbors' arguments to the contrary are unconvincing.

¶ 27. Neighbors argue that § 4.15(F)(5)(b) is to similar effect. It provides as follows:

Any tower designed to accommodate not more than two providers shall not exceed a maximum height of 100 feet. The Board may allow taller towers, in accordance with these standards, up to the maximum of 180 feet, to encourage colocation and discourage multiple facilities.

Neighbors would construe this section as requiring proof — in the form of contracts or letters of intent — that a proposed tower will definitely be used for colocation. The Environmental Court's construction, as implied in its approval of the 180-foot tower, is that the section simply requires that the tower be "designed to accommodate" more than two providers in order to benefit from the increased height provision. The court's construction is not clearly erroneous, arbitrary, or capricious, but rather gives effect to the plain language of the statute. We will not disturb it on appeal.

*Affirmed.*