2011 VT 78

## In re RINKERS, INC. and Shepard Act 250 Land Use Permit

[27 A.3d 334]

No. 10-446

¶ 1. July 13, 2011. The question this case presents is whether a 180-foot telecommunications tower in the town of Hardwick would have an undue adverse effect on the aesthetics of the area in violation of Criterion 8 of Act 250. Neighboring landowners appeal the issuance of an Act 250 land-use permit for the project. Specifically, they contest (1) whether the project violates a clear, written community standard intended to preserve the aesthetics of the area, and (2) whether a reduction of the tower's height is a mitigating step that the developer should have taken to improve the harmony of the project with its surroundings. We affirm the decision of the Environmental Division of the Superior Court (Environmental Court) in determining that the tower will not have an undue adverse effect under Criterion 8.

¶ 2. The town of Hardwick is located in northeastern Vermont, amidst a backdrop of farms, rolling hills, and distant mountain ranges. It is a rural-agricultural setting devoid of any industrial or major commercial development. Bridgman Hill Road runs north out of town through a wooded residential area and into open farmland divided by hedgerows and stands of trees. Rinkers Communication, Inc., (Rinkers) proposed building a 180-foot telecommunications tower 1.27 miles from the village of Hardwick on a property located on Bridgman Hill. The proposed site is in a field near the height of the land, surrounded on three sides by a dense band of trees, some of which are as tall as eighty-five feet. There is a farm silo

located nearby, as well as a wind turbine mounted on a one-hundred-foot tower.

¶ 3. The proposed site has been used for telecommunications equipment for approximately twenty-five years; a forty-three-foot wooden pole equipped with antennas for pagers, cellular telephones, and emergency personnel dispatch is currently located there. Rinkers leases the land, but owns the pole and equipment and wishes to replace it with a taller structure in order to maximize the signal distance and coverage and to allow for the co-location of other antennas. The proposed tower will be 180 feet tall, and with affixed antennas the overall height of the structure will be just under 200 feet. Since the base of the tower will be located on a slope, it will sit twenty-three feet below the elevation at the property boundary. At the present height of the trees — which may grow up to one-hundred feet tall — approximately the top ninety-five or one-hundred feet of the structure will be visible when viewed from the north or the west. The tower will be built out of galvanized steel that weathers to a grey color and will be of an open lattice-type construction. These design details have the effect of minimizing the tower's visual impact.

¶ 4. Telecommunications technology requires a line of sight between antennas. An unavoidable consequence of this reality is that effective towers are tall towers, and tall towers can be visible additions to a landscape. The portion of the tower above the trees will be visible from various points in the village and along the roadways through town; however, other than to travelers on Bridgman Hill Road, views of the tower will be brief in duration. From the village itself, the distant tower will be unobtrusive when seen between nearer commercial structures such as signs and gasoline station canopies. To travelers on Bridgman Hill Road, the tower will be a more significant but not overwhelming presence as it would be frequently screened by roadside trees or off to the side of the road and not directly in view. The view of the tower will be the most obtrusive to those who live near it, as the top half of it will be visible from their homes and farms.

¶ 5. Rinkers has provided paging services for over twenty-five years. A substantial portion of its clientele is emergency responders. Because of its height, the existing tower cannot send a dependable paging signal into the town of Hardwick, nor can it provide reliable dispatching service for the police or adequate cellular telephone service. The proposed tower will remedy these deficiencies and provide greater coverage to the surrounding area. In order to provide its paging service, Rinkers will place a transmission antenna at the 180-foot level of the pole and a receiving antenna at the 100-foot level. This placement is necessary because each twenty-foot antenna must be placed above the surrounding trees and have sixty feet of vertical separation to avoid interference. One cellular phone company, AT&T Mobility, plans to place cellular telephone antennas at the 160-foot level in order to provide greater coverage to the Hardwick area, and at least one other cellular provider has expressed interest in locating antennas on the tower. Additionally, Hardwick emergency service dispatch hopes to use space on the tower, as does the Vermont Electric Power Company (VELCO).

¶ 6. On June 1, 2004, Rinkers submitted a zoning permit application to the town of Hardwick for the construction of the tower. The town issued a conditional-use permit, and a group of neighbors appealed this decision to the Environmental Court. We subsequently affirmed that decision. *In re Shaw*, 2008 VT 29, 183 Vt. 587, 945 A.2d 919 (mem.). Rinkers then applied for an Act 250 land-use permit, which the District 7 Environmental Commission issued to Rinkers and the owners of the proposed site in November 2008.

Several neighbors appealed the permit to the Environmental Court. The sole issue in their de novo appeal was the impact of the tower on the area's aesthetics, assessed under Criterion 8 of Act 250. See 10 V.S.A. § 6086(a)(8). The court ruled that, while the tower would have an adverse effect on the surroundings, the effect would not be undue. It specifically concluded that the tower's impact would not be undue because its construction would not violate a clear, written community standard intended to preserve the aesthetics of the area, the tower would not offend the sensibilities of the average person, and Rinkers had taken generally available mitigating steps to improve the harmony of the tower with its surroundings. The court then issued the permit to Rinkers.[1] After the court denied neighbors' motion to reconsider, neighbors appealed. AT&T filed a brief as amicus curiae in support of Rinkers.[2]

¶ 7. Neighbors argue on appeal that the Environmental Court erred in granting the permit because it failed to adequately consider Rinkers' ability to mitigate the aesthetic impact of the tower by shortening its height. They further challenge the court's finding that the project did not violate a clear written community standard. We find no error in the Environmental Court's conclusions or findings, and thus we affirm.

¶ 8. Our review of Environmental Court decisions is generally deferential. See *In re Eastview at Middlebury, Inc.*, 2009 VT 98, ¶ 10, 187 Vt. 208, 992 A.2d 1014. Be-cause the Environmental Court determines the credibility of witnesses and weighs the persuasive effect of evidence, "we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *Id.* (quotations omitted). We will overturn factual findings only "where the party contesting them demonstrates that there is no credible evidence to support them," and not "merely because they are contradicted by substantial evidence." *Id.* (quotations omitted). We likewise uphold the court's legal conclusions with respect to compliance with Act 250 criteria when they are reasonably supported by the findings. *Id.*

¶ 9. Criterion 8 of Act 250 requires that proposed projects "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). Of these elements, the only one at issue below and on appeal is whether the proposed tower will have an undue adverse effect on aesthetics. In analyzing whether a project will have such an effect, the Environmental Court properly applied the two-part *Quechee* test, first determining "if the proposed project will have an adverse aesthetic impact," and, because it did, second considering "whether the adverse impact would be undue." *Eastview at Middlebury*, 2009 VT 98, ¶ 20 (quotations omitted). The second prong of this test requires evaluating three factors to determine whether the adverse impact is undue — it is this weighing that neighbors challenge on appeal. In performing this evaluation, the court must examine if the project:

> (1) violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area, (2) offends the sensibilities of the average person, or (3) the appli-

---

[1] The owners of the proposed site did not enter an appearance in the Environmental Court and are not appellees before this Court.

[2] In their reply brief, neighbors complain that AT&T failed to file a motion to appear as an amicus. See V.R.A.P. 29. AT&T was granted amicus status below; in any event, we do not rely on the amicus brief in our decision.

cant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

*Id.* Neighbors challenge only the first and third elements of this second prong, and we address these claims in turn.

¶ 10. In determining whether the project would violate a clear, written community standard, the Environmental Court looked to the Hardwick Town Plan. In the "Land Use" section of the Plan in effect at the time of the application, the stated "Goal" was to "[m]aintain Hardwick's present patterns of land use: dense residential and commercial uses . . . and sparsely developed agricultural and forest land outside the[] village centers, with a rural and natural skyline." Hardwick Town Plan at 12. Neighbors argue that the final phrase of the goal section presented the court with a clear community standard to protect "a rural and natural skyline." Even assuming that this phrase was sufficiently "clear" for consideration under the *Quechee* test, neighbors' reading of the standard is too broad and is contradicted by the Plan as a whole. If considered a clear community standard, "[m]aintaining . . . a rural and natural skyline" would effectively preclude the construction of any nonrural structure that disrupted the skyline, including any telecommunications antennas or towers. As the Environmental Court recognized, "the Town Plan states a policy balancing the Town's need for modern telecommunications facilities and the inherent intrusiveness of towers in the landscape by promoting co-location and allowing taller tower structures to achieve co-location." Adopting neighbors' reading of the Plan to create an absolute prohibition on disruptions to the rural skyline would contradict the Plan's clearly stated policy favoring *some* telecommunications towers

which must necessarily reach above the tree- and ridge-lines. The court properly concluded the project would not violate a clear standard. Thus, we find no error, and neighbors' reliance on previous Environmental Court cases does nothing to sway our opinion.

¶ 11. The remainder of neighbors' appeal focuses on Rinkers' failure to "take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings," *Eastview at Middlebury*, 2009 VT 98, ¶ 20, specifically the fact that Rinkers failed to reduce the height of the tower. They claim: (1) the evidence demonstrated that the height of the tower could be reasonably reduced while still providing sufficient coverage and sufficient opportunity for co-location; (2) the Environmental Court erroneously relied on the Town Plan's preference for co-location rather than proliferation of towers as support for the tower's height; and (3) the evidence does not support the court finding that the trees surrounding the project site will reach one-hundred feet tall at maturity.

¶ 12. When a project is found to have an adverse impact on aesthetics, the applicant must "take generally available mitigating steps to reduce the negative aesthetic impact of a particular project," otherwise, "[f]ailure to take advantage of available alternatives may render an aesthetic impact unduly adverse." *In re Stokes Commc'ns Corp.*, 164 Vt. 30, 39, 664 A.2d 712, 717-18 (1995). Ordinarily "a generally available mitigating step is one that is reasonably feasible and does not frustrate [either] the project's purpose or Act 250's goals." *Id.* at 39, 664 A.2d at 718. In assessing the impact of the proposed tower's height, the Environmental Court recognized that Rinkers had not taken mitigating steps to reduce the height of the tower from the maximum height permitted by Hardwick's regulations. That said, the court held that Rinkers demon-

strated that "reducing the height of the tower would frustrate both the project's purpose of providing coverage in all directions and the Town Plan's preference for co-location of such services rather than the proliferation of towers."

¶ 13. The heart of neighbors' argument is a challenge to the sufficiency of the evidence and the findings of the court. They claim that while they, as opponents to the project, had the burden of proving that the adverse effect of the tower would be undue, 10 V.S.A. § 6088(b), Rinkers failed to prove the tower needed to reach 180 feet in height. This contention is contradicted by the record before the Environmental Court, and we will not disturb that court's findings on this record. See *Shaw*, 2008 VT 29, ¶ 10 ("The fact that neighbors — or even this Court — might have weighed the evidence differently is not grounds for reversal."). The court had before it testimony regarding Rinkers' need for adequate spacing between its two pager antennas, its need to have both the sending and receiving antennas above the surrounding trees, and its need to maximize the tower's height to increase signal coverage. Neighbors never challenged this testimony or presented any countervailing testimony. See *id.* ¶ 7 ("The environmental court's findings of fact will be upheld if based on relevant, admissible evidence that a reasonable person would consider as supporting the conclusion." (quotation omitted)). Their citation to potentially contradictory evidence in the record is unpersuasive, even if we considered it substantial. See *Eastview at Middlebury*, 2009 VT 98, ¶ 10 ("[F]actual findings will not be disturbed merely because they are contradicted by substantial evidence." (quotation omitted)). Their argument on appeal is that a shorter tower would still provide "sufficient" or "adequate" coverage, but they did not show that such coverage would satisfy the project's purpose of expanding coverage to areas of

the village and surrounding roadways that currently lack reliable service for pagers, cellular phones, or emergency-response communication. Regardless, the Environmental Court concluded that a shorter tower would not adequately meet these needs, and this conclusion was not clearly erroneous.

¶ 14. Neighbors next claim the court lacked sufficient evidence to find that reducing the tower's height would frustrate the Town Plan's preference for co-location. Assuming that the Environmental Court relied on this rationale as heavily as it did the fact that a lower height would frustrate the project's purpose, we address this claim. Neighbors essentially argue that Rinkers has shown that only two cellular companies are interested in locating on the tower and because each would require ten feet of vertical space, the tower could be significantly shorter. They also suggest that the Environmental Court erred in considering VELCO and Hardwick emergency services as users of this additional vertical space. Again, this is an unsupported challenge to the court's findings. The court never found that VELCO's or Hardwick emergency services's use of the tower necessitated a greater height. In fact, the court was explicit that the 180-foot height would permit up to six *other* users to co-locate. The fact that only two such users had come forward at the time of the permit application does not render this reasoning faulty. Additional space on the tower for future, albeit unknown users is precisely what the Town Plan envisions in aiming to limit the total number of towers built around the town.

¶ 15. Finally, neighbors attack the Environmental Court's finding that the trees in the vicinity of the project will reach one-hundred feet in height. The court did not clearly rely on this finding to support its conclusion that the tower's height could not reasonably be reduced. It does not appear in the conclusions of law re-

garding height. Regardless, neighbors themselves point to the fact that there *was* testimony — unchallenged below — regarding the potential mature-height of the neighboring trees; they simply malign its credibility. As stated above, we will not second-guess the Environmental Court's assessment of truthfulness in this tribunal.

*Affirmed.*