STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 130-9-13 Vtec |
| Hovey A250 Permit | DECISION ON THE MERITS |

Robert and Toni Flanigan (the Flanigans) appeal the September 6, 2013 decision of the District #7 Environmental Commission (Commission) granting Gregory Hovey (Mr. Hovey) an after-the-fact Act 250 Land Use Permit (LUP) to construct and operate a dog breeding facility in the Town of Victory, Vermont. In April 2014, while this appeal was pending before the Court, Mr. Hovey filed an application to amend the LUP (the -1 Application). The Commission approved the -1 Application and issued an amended Land Use Permit. The Flanigans appealed that approval to this Court. All parties agree that because the original LUP was before the Court on appeal, the Commission was without jurisdiction to consider the -1 Application. As ordered below, we therefore **VOID** the Commission's approval of the -1 Application, and **DISMISS** Docket No. 57-4-14 Vtec.

Prior to trial, Mr. Hovey filed a Motion to Dismiss and the Flanigans filed a Motion to Amend and Clarify their Statement of Questions. In a March 6, 2014 decision we denied Mr. Hovey's motion to dismiss, granted the Flanigans' motion to amend and clarify their Statement of Questions with respect to Amended Questions 1, 2, 3, 5 and 6, and denied the Flanigans' motion to amend and clarify their Statement of Questions with respect to Amended Questions 4 and 7.

On November 10, 2014, the parties filed a Joint Stipulation as to Statement of Questions. By this stipulation, the Flanigans' withdrew Amended Questions 5 and 6 on the condition that Mr. Hovey remove dog waste daily should the Court affirm the Commission's

grant of the Land Use Permit.[1]  Thus, Amended Questions 1, 2, and 3, relating to Criterion 1 (Air Pollution – noise) and Criterion 8 (Aesthetics – noise), remain for the merits hearing.

The Court conducted a site visit to the Property on November 12, 2014 immediately followed by a single day merits hearing at the Vermont Superior Court, Caledonia Civil Division courthouse in St. Johnsbury, Vermont.  Appearing at the site visit and trial were the Flanigans and their lawyer Hans G. Huessy, Esq., Gregory Hovey and his lawyer Deborah T. Bucknam, Esq., and the Vermont Natural Resources Board's lawyer Melanie Kehne, Esq.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1.   Mr. Hovey owns a 10.4 acre parcel of land located at 3000 Victory Hill Road in Victory, Vermont (the Property).

2.   Mr. Hovey resides at the Property.

3.   In 2013, Mr. Hovey constructed and began operating a dog kennel at the Property (the Project).  The kennel is known as Victory Hill Kennels.

4.   Upon learning that the Project triggered the need for an Act 250 land use permit, Mr. Hovey filed an application with the District #7 Environmental Commission (the Commission).

5.   On September 6, 2013 the Commission issued Act 250 Land Use Permit #7E1340 (LUP) for the Project.

6.   The LUP restricts the Project to 50 dogs.  During the Court's November 12, 2014 site visit, the Project included 41 dogs which were either Beagles or Labrador Retrievers.  At the time of the Flanigans' noise monitoring in July 2014, the Project had 23 dogs.

7.   Tom Duane owns property adjacent to the north of the Property.  Mr. Duane did not participate in this appeal.

8.   Doug Preston owns property abutting the Duane property to the north.  Mr. Preston cannot hear Project dogs barking when his windows and doors are closed.  Mr. Preston does not generally hear Project dogs barking when he drives by the Property.

---

[1] The stipulation also withdraws Amended Question 4, however, this is unnecessary as the Court previously dismissed Amended Question 4.

9.  Victory Hill Road is a dead end road terminating approximately 200 yards north of the Property. The Duane and Preston properties are the only properties to the north of the Property.

10. The Flanigans own property at 2870 Victory Hill Road adjacent to the south of the Property. The Flanigans have a residence on their property which is approximately 150 yards from the Project.

11. There is approximately 70 yards of wooded land between the Flanigans residence and the Project.

12. The Flanigans do not reside full time at their Victory property; they estimate that they spend on average about one weekend a month there.

13. The MacDonald/Loomis property is located at 2754 Victory Hill Road to the south of the Flanigans. They have two Labrador Retrievers.

14. Ryan Hovey is the first cousin of Greg Hovey. Ryan Hovey owns and lives at 2622 Victory Hill Road to the south of the MacDonald/Loomis property. Ryan Hovey runs a dog kennel at his property, which is located approximately 1000 feet south the Flanigan's southern property boundary. In June 2014, Ryan Hovey had 19 Labrador Retrievers at his kennel. At the time of our merits hearing, Ryan Hovey had 5 dogs at this kennel.

15. Skip Easter owns property at 2428 Victory Hill Road adjacent to the south of Ryan Hovey's property and approximately one half mile from the Project. Mr. Easter serves as a foster home for dogs. He has up to 5 dogs at a time. His dogs bark when they are outside or when someone comes to visit. He hears other dogs in the neighborhood including the Project dogs.

16. Mr. Easter and Fern Loomis testified that they cannot hear Ryan Hovey's Labrador Retrievers bark but can hear Greg Hovey's Beagles bark.

17. Ruth Neborsky has lived for 12 years at 2364 Victory Hill Road which is to the south of the Easter Property. Ms. Neborsky has one dog and she occasionally hears dogs barking from other properties.

18. Dogs at the Project are well managed which limits their barking.

19. Project management activities undertaken by Mr. Hovey include feeding and watering during regular hours and in a time limiting fashion. Mr. Hovey prepares food ahead of time, which shortens the time he is at the kennels during feeding, which can be as short a 7 to 8 minutes. He feeds the dogs early in the morning and provides water at nighttime.

20. Mr. Hovey also cleans the kennels once per day in the early afternoon.

21. The kennels are designed with adequate space and the Beagles are exercised weekly in field training.

22. Mr. Hovey uses electronic collars to control excessive barking.

23. Approximately 155 forsythia plants were planted in the fall of 2014 around the perimeter of the kennels. Each plant is fairly small and thin. The plants are expected to grow as much as three feet per year.

24. Aaron Bronkdyke, Vermont Natural Resources Board (NRB) compliance investigator, conducted an unannounced site inspection to the Project on January 30, 2014. Mr. Bronkdyke observed no dog barking from the Project when he drove to the site, exited his car, or when he first entered the Property. When Mr. Bronkdyke approached within 25 feet of the kennels, the Labrador Retrievers barked, but the Beagles did not. When Mr. Bronkdyke turned so he was not facing the kennels, the dogs immediately stopped barking.

25. The Flanigans retained David-Michael Lozupone of Resource Systems Group (RSG) to conduct noise monitoring. Mr. Lozupone collected noise and wind data over a ten day period between June 13, 2014 and June 23, 2014; more specifically, he collected 9 days of sound pressure level data and 10 days of audio data.

26. Mr. Lozupone placed noise monitoring equipment in the Flanigan's northern yard, 10 yards south of the tree line and 5 yards north of the house. The equipment was approximately 40 yards from the center of Victory Hill Road.

27. In addition to barking dogs, noise in the area is attributable to birds, insects, and wind.

28. The A-weighted sound level (dBA) is a logarithmic expression of the relative loudness of sound as perceived by the human ear.

4

29. The maximum sound level (Lmax) represents the maximum sound level of a noise event, irrespective of its duration.

30. The equivalent sound level (Leq) represents the average sound level from all sources of noise in a given area over a stated period of time (e.g. 24 hours, one year, etc.). Leq represents the energy average, rather than the arithmetic average, and is equivalent to a steady sound of the same magnitude over a given period of time. Because the Leq is based on the logarithmic average sound pressure, it gives more weight to the higher decibel levels.

31. The percentile sound level (Ln) represents the noise level exceeded n% of the measurement period. $L_{90}$ therefore represents the noise level exceeded 90% of the measurement period, whereas $L_{50}$ represents the noise level exceeded 50% of the measurement period. Because $L_{90}$ represents the quieter portion of a measurement period (90% of the observations exceed it), it is often used to establish the ambient or background sound level in an environment.

32. During the Flanigans' 10 day noise monitoring period, the daytime $L_{90}$ and $L_{50}$ were estimated to be 25 dBA and 34 dBA, respectively, and the nighttime $L_{90}$ and $L_{50}$ were estimated to be 24 dBA and 29 dBA, respectively.

33. There were 76 incidents of dog barking over the 10 day noise study, or an average of 8 incidents per day. The duration of barking events lasted from 4 to 60 minutes, with durations averaging between 4 to 21 minutes.

34. Daytime and nighttime maximum sound levels—Lmax—were recorded on June 20, 2014 at 6:58 PM and 7:40 PM as 64 and 62 dBA, respectively.[2]

### Conclusions of Law

The legal questions presented in this appeal are whether Applicant's proposed use of the Property will result in undue air pollution as it relates to noise under Act 250 Criterion 1,

---

[2] Mr. Hovey provided a July 31, 2014 letter from Eric Reuter or Reuter Associates commenting on the Flannigans noise data collection report. Exhibit D. Mr. Reuter's letter appears to refer to a draft of Table 2 of Mr. Lozupone's report having different maximum noise data. We note that Mr Lozupone's report states in its subject line "Hovey Dog Kennel Noise Consultation with Table 2 Correction." Exhibit A.

and/or result in an undue adverse impact to aesthetics relating to noise under Act 250 Criterion 8. The Amended Statement of Questions 1, 2, and 3 ask the following:

1. Does the Project comply with Criteria 1 (Air Pollution) and 8 (Aesthetics) with respect to noise?
2. Does the noise from the Project exceed the noise standards established by this Court, i.e. 70 dBa at the Property line and 50 dBa at the nearest residence?
3. Is the noise from the Project of a quality and nature that can be found to have an undue adverse impact even if it does not exceed the established noise standards?

## I.   Burden of Proof

As discussed below, the burden of proof in this matter has bearing on the Court's ultimate conclusions. The burden of proof is on the applicant (here, Mr. Hovey) for Criterion 1, and on the party opposing the application (here, the Flanigans) for Criterion 8. 10 V.S.A. § 6088. Regardless of who has the burden of proof on a particular issue, the applicant always has the burden of producing evidence sufficient to enable the Court to make the requisite positive findings on all of the criteria. Re: EPE Realty Corp. and Fergessen Mgmt., Ltd., No. 3W0865-EB, Findings of Fact, Concl. of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 24, 2004) (citing Re: Peter S. Tsimortos, No. 2W1127-EB, Findings of Fact, Concl. of Law, and Order, at 13 (Vt. Envtl. Bd. Apr. 13, 2004); Re: McLean Enter. Corp., No. 2S1147-1-EB, Mem. of Decision, at 43 (Vt. Envtl. Bd. Sept. 19, 2003)). Specifically with respect to Criterion 8, if an applicant satisfies the initial burden of production, the ultimate burden of proving that a project does not conform to Criterion 8 rests upon the project's opponents. 10 V.S.A. § 6088(b); In re Rivers Dev. Act 250 Appeal, No. 68-3-07 Vtec, slip op. at 33 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.) (citing In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.), aff'd, 2008 VT 88, 184 Vt. 283).

## II.   Criterion 1

The noise a proposed project may generate can be of such an adverse level as to constitute air pollution. See Re: Bull's-Eye Sporting Center, No. 5W0743-EB, Findings of Fact, Concl. of Law, and Order, at 14 (Vt. Envtl. Bd. Feb. 27, 1997) ("The test for undue air pollution caused by noise is whether the noise has 'impacts rising above annoyance and aggravation to cause adverse health effects such as hearing damage.'" (quoting Re: Talon Hill Gun Club' Inc. and John Swininem, No. 9AO192-2-EB, Findings of Fact, Concl. of Law, and Order, at 8 (Vt. Envtl.

6

Bd., June 7, 1995))). "Noise analysis under Criterion 1 focuses primarily on the health and safety impacts of noise, rather than on its welfare and aesthetic impacts, which are considered under Criterion 8." In re Godard College, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 9 (Vt. Super. Ct. Envtl. Div. Jan. 6 2014) (Walsh, J.) (citing Re: City of Montpelier and Ellery E. & Jennifer D. Packard, No. 5W0840-6-WFP, Findings of Fact, Concl. of Law, and Order, at 21 (Vt. Envtl. Bd. May 22, 2000)).

The former Environmental Board reviewed many Act 250 applications for land use permits where noise from a proposed project was at issue. The prior decisions of the Environmental Board established thresholds or limits of noise levels evidencing compliance or non-compliance with Criterion 1. Title 10 V.S.A. § 8504(m) directs us to give these prior decisions of the Environmental Board the same weight and consideration as prior decisions of this Court.

When evaluating noise impacts under Criterion 1, the Environmental Board relied on the United States Environmental Protection Agency (EPA) Report, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, EPA document No. 5 50/9-74-0004, dated March 1974, for guidance. See Re: Paul and Dale Percy, No. 5L0799-EB, Findings of Fact, Concl. of Law, and Order, at 7-8, 17 (Vt. Envtl. Bd. Mar. 20, 1986). Specifically, the Environmental Board adopted EPA's standard based on the risk of hearing loss or other adverse health effects caused by nearly continuous exposure to noise. Bull's Eye Sporting Center et al., #5W0743-2-EB, Findings of Fact, Concl. of Law, and Order, at 14. Under this standard, noise is considered air pollution under Criterion 1 if it exceeds a maximum Leq of 70 dBA for 24 hours a day, 365 days a year over a lifetime. Re: Pike Indus., Inc. and Inez M. Lemieux, No. 5R1415-EB, Findings of Fact, Concl. of Law, and Order, at 32 (Vt. Envtl. Bd. June 7, 2005); Re: Casella Waste Mgmt. and E.C. Crosby & Sons, Inc., No. 8B0301-7-WFP, Findings of Fact, Concl. of Law, and Order, at 29–30 (Vt. Envtl. Bd. May 16, 2000). Furthermore, the Environmental Board determined that maximum noise levels consistently lower than 90 decibels did not constitute air pollution under Criterion 1. Casella Waste Mgmt., No. 8B0301-7-WFP, at 30; Wildcat Constr. Co., No. 6F0283-1-EB, Findings of Fact,

Concl. of Law, and Order (Vt. Envtl. Bd. Oct. 4, 1991), aff'd, In re Wildcat Constr. Co., 160 Vt. 631 (1993).

Based upon the totality of evidence before the Court, we find that Mr. Hovey has produced evidence sufficient to enable the Court to make positive findings on Criterion 1. We conclude that while noise from the Project operations might be apparent to the Flanigans and other area property owners and neighbors, the noise will be less than the EPA-established adverse health impact standard of an Leq less than 70 dBA for 24 hours each day, 365 days a year. Thus, the proposed project noise will not cause adverse health effects and is, therefore, not air pollution in violation of Criterion 1.

## III.    Criterion 8

As discussed above, to receive an Act 250 land use permit the Court must find that the proposed project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas."   10 V.S.A. § 6086(a)(8).   While it is the applicant that must satisfy the initial burden of production, the ultimate burden of proving that a project does not conform to Criterion 8 rests upon the project's opponents.  10 V.S.A. § 6088(b); In re Rivers, No. 68-3-07 Vtec, slip op. at 33 (citing In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.), aff'd, 2008 VT 88, 184 Vt. 283).

Whether noise produced by a proposed project will have an undue adverse effect is assessed using a two-step evaluation.  First, the Court reviews whether a project would have an "adverse impact" by considering the question: "[w]ill the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?"  Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Concl. of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985).  If the Court concludes that the Project has an adverse effect under Criterion 8, we then evaluate whether the adverse effect is "undue."  Id. at 18.

### a.  The character of the area.

Whether noise produced by a proposed project is out of character with its setting is a qualitative determination, involving an examination of both the neighboring land uses and the type of noise that the project will generate.  Hannaford Bros. Co. and Southland Enterprises,

Inc., No. 4C0238-5-EB, Findings of Fact, Concl. of Law, and Order, at 16 (Vt. Envtl. Bd. Apr. 9, 2002). We therefore weigh the following factors collectively: the nature of the project's surroundings, the compatibility of the project's design with those surroundings, and the locations from which the project can be heard. See Id. at 15–18 (analyzing a project under Criterion 8 for potential adverse effect of noise and signage on aesthetics).

Here, the Project's surroundings include several residences with access from Victory Hill Road. Victory Hill Road is unpaved and generally characterized as a secondary road. The closest residence is approximately 150 yards from the Project and is separated by approximately 70 yards of trees. There is an $L_{90}$ dBA of 24 to 25. This area of Vermont is rural.

### b. Whether the noise impacts are "adverse" to the area's character.

Assessing the impacts of the Project on the surroundings is a fact specific determination, including the type of noise. Precedent has long considered that different types of noises—such as sharp, intermittent, or high frequency noises—must be treated differently from low frequency continuous noises. See Id. at 16 (citing Bull's Eye Sporting Center et al., No. 5W0743-2-EB, Findings of Fact, Concl. of Law, and Order, at 17). Although a bark itself, and intermittent barking events, do not represent a significant departure from existing land uses in the area—Ryan Hovey operates a kennel to the south of the Flanigans' property and there are several dogs in the area, all of which produce intermittent dog barking—we conclude that the Project itself does not fit the context of this rural neighborhood. On the totality of the evidence, we conclude that adding a dog kennel with a maximum of 50 dogs would produce an adverse effect on the area under Criterion 8. See John and Joyce Belter, No. 4C0643-6R-EB, Findings of Fact, Concl. of Law, and Order, at 14 (Vt. Envtl. Bd May 28, 1991) (concluding that additional drilling and blasting would be more than the neighborhood was already used to on a regular basis, thus, the noise would have an adverse effect on aesthetics).

### c. Whether the adverse noise impact is "undue."

Having concluded that the proposed project's noise is adverse, the Court conducts the second evaluative step by reviewing whether the adverse effect is undue. Hannaford Bros., No. 4C0238-5-EB, at 15. To determine whether an adverse effect is undue, the Court reviews the following factors:

9

1) Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area?
2) Does the project offend the sensibilities of the average person? Is the project offensive or shocking because it is out of character with its surroundings or significantly diminishes the scenic qualities of the area?
3) Has the Applicant failed to take generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings?

See In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567; Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Concl. of Law, and Order, at 19–20 (Vt. Envtl. Bd. Nov. 4, 1985).

The parties did not provide any evidence of the existence of community standards intended to preserve the aesthetics or scenic, natural beauty of the area. As the Flanigans have the burden to show that a project does not conform to Criterion 8, we conclude that the proposed project does not violate any community standard.

We next consider whether the noise will be so out of character with its surroundings or so significantly diminish the scenic qualities of the area as to be offensive or shocking to the average person. Re: Pike Indus., Inc. and William E. Dailey, Inc., No. 1R0807-EB, Findings of Fact, Concl. of Law, and Order, at 18–19 (Vt. Envtl. Bd. June 25, 1998). This requires consideration of the Project's impacts from the perspective of the average person, and not simply testimony from neighboring landowners as to how the Project impacts them personally. See In re Godard College, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Jan. 6 2014) (Walsh, J.)

As discussed above, adding more intermittent dog barking noise to an area that already experiences such noise would produce an adverse effect. We cannot, however, say that the adverse effect is "shocking or offensive to the average person." Residents in the area are used to hearing sporadic dog barking noise from other residential properties in the area, including another dog kennel. The impact of noise is not entirely reflected by a decibel rating; it must also consider the intermittency and duration of noise. See Re: Bull's Eye Sporting Center et al., #5W0743-2-EB, Findings of Fact, Conclusions of Law, and Order at 17. As the Environmental Board has explained, "[t]he impact or quality of noise is not entirely reflected by decibel rating. The degree of noise annoyance must also consider the duration and intermittency of noise." Id.

The Flanigans' 10 day noise study shows an average of 8 instances of dogs barking per day, and that the typical duration of such events last between 4 and 21 minutes, although one event did last for 60 minutes. During this 10 day period, the instantaneous maximum noise levels were recorded on a single day, June 20, 2014, at 6:58 and 7:40 PM from the Flanigans' property as 64 and 62 dBA Lmax, respectively. There is no indication that these barking events lasted for a prolonged period of time or that similar barking events at similar times occurred on other dates. Furthermore, although the Flanigans and other neighbors testified to loud dog barking noises at night, even to the degree of waking them up, there was no noise data offered to support nighttime barking of this nature. Additionally, Mr. Easter and Fern Loomis testified that they cannot hear Ryan Hovey's Labrador Retrievers bark but can hear Greg Hovey's Beagles bark even though Ryan Hovey's kennel is much closer than Greg Hovey's. These statements go against reason and without credible data in support of this testimony we cannot afford it much weight. We therefore conclude that the Project does not offend the sensibilities of the average person and it is not out of character with its surroundings. While the barking may be annoying, it would not disrupt day to day living to the level that is shocking and offensive.

With respect to mitigating steps to reduce the level or impact of noise from the proposed activities, we note the following facts. Mr. Hovey employs a feeding and watering routine where he prepares food ahead of time in order to shorten his time at the kennel during feeding, sometimes to as short as 7 to 8 minutes. He feeds the dogs early in the morning and provides water at nighttime, cleans the kennels once per day in the early afternoon, and uses electronic collars all of which aid to control excessive barking. Furthermore, Mr. Hovey has planted immature forsythia which, over time, may serve to reduce the noise of dogs barking. All of these measures serve to reduce barking events and durations and mitigate noise impacts.

Considering the evidence before the Court as a whole, including both an examination of the type and frequency of noise that the Project will generate and the neighboring land uses, we conclude that the proposed project, as conditioned, will not have an undue adverse effect on the character of the area. We reach this conclusion as Appellant has not provided evidence of noise levels or other data demonstrating that noise levels from the Project create an undue

adverse aesthetic impact.  See 10 V.S.A. § 6088(b) (placing ultimate burden of showing a project's nonconformance to Criterion 8 on the project's opponents).  Thus, we conclude that the proposed project complies with Criterion 8.

In reaching our positive finding under Criterion 8, we consider prior Act 250 approvals which concluded that noise from a proposed project does not have undue adverse impacts on aesthetics where the noise is limited to no more than 55 dBA Lmax at surrounding residences and outside areas of frequent human use and no more than 70 dBA Lmax at the property line. Barre Granite Quarries, No. 7C1079(Revised)-EB, Findings of Fact, Concl. of Law, and Order, at 81–82 (Vt. Envtl. Bd. Dec. 8, 2000); see also Re: Alpine Stone Corporation, ADA Chester Corp. and Ugo Quazzo, No. 2S1103-EB, Findings of Fact, Concl. of Law, and Order, at 32 (Vt. Envtl. Bd., Feb. 4, 2002) (noise from a proposed quarry does not have undue adverse impacts on aesthetics where the noise is limited to 55 dBA Lmax at areas of frequent human use).  These noise limits are typically established for commercial or industrial operations, where noise is more regular in duration as compared to intermittent dog barking.  See Hannaford Bros., No. 4C0238-5-EB, at 24 ("For commercial operations such as quarrying operations, the Board has set maximum sound levels (Lmax) at either the applicant's property line or at relevant receptors on neighboring property, or both.").  In this case a dog bark or barks have limits on the level of noise created.  In such instances, establishing maximum noise levels is less of an issue than regulating the duration and frequency of barking or barking events.  See Re: John and Joyce Belter, #4C0643-6REB, Findings of Fact, Conclusions of Law, and Order at 13–15 (May 28,199l) (distinguishing between noise of limited duration and continuous noise).  Thus, to ensure that the dog kennel does not result in an undue adverse impact from noise, we condition this approval under Criterion 8 as follows:

> Prolonged barking at the dog kennel shall be prohibited.
> Prolonged barking is considered to be sustained barking for
> one hour or more during the daytime or sustained barking
> for 30 minutes or more during the nighttime.

The Court establishes this condition and leaves Mr. Hovey to determine how to satisfy the condition.  See Re: George and Diana Davis, No. 2S1129-EB, Findings of Fact, Concl. of Law, and Order, at 11 (Vt. Envtl. Bd. Dec. 15, 2004); Hannaford Bros., No. 4C0238-5-EB, at 23.  Should

the Flanigans or other interested parties experience noise impacts exceeding these levels, they may come forward to the Natural Resources Board with evidence of non-compliance. Such evidence may be used in consideration of enforcement against Mr. Hovey for violating this approval or lead to revocation of the land use permit.

## Conclusion

For the reasons discussed above, all parties agree that as the original Land Use Permit was on appeal before the Court, the Commission was without jurisdiction to consider the -1 Application. We therefore **VOID** the Commission's approval of the -1 Application, and **DISMISS** Docket Number 57-4-14 Vtec.

Pursuant to the parties' Stipulation and agreement to withdraw Amended Questions 5 and 6, we impose the following condition:

1. All dog waste shall be removed from the kennels daily.

We also conclude that Mr. Hovey's proposed project does not result in undue air pollution relating to noise under Act 250 Criterion 1 and that the proposed project does not result in an undue adverse impact to aesthetics relating to noise under Act 250 Criterion 8. We condition our positive findings under Criteria 1 and 8 on the following:

2. Prolonged barking at the dog kennel shall be prohibited. Prolonged barking is considered to be sustained barking for one hour or more during the daytime or sustained barking for 30 minutes or more during the nighttime.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.

Electronically signed on March 31, 2015 at 02:25 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

13